COURT OF APPEALS
DECISION
DATED AND FILED

June 7, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1137-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2021CF54**

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

V.

BRIAN D. WILLIS,

    DEFENDANT-RESPONDENT.

---

APPEAL from a judgment of the circuit court for Calumet County: JEFFREY S. FROEHLICH, Judge. *Reversed and cause remanded*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. The State charged Brian D. Willis with one count of stalking in violation of WIS. STAT. § 940.32(2) (2021-22).[1] The circuit court granted Willis's motion to dismiss the case after concluding that the allegations in the amended complaint did not establish probable cause to believe that Willis's conduct satisfied several elements in the statute. The State appeals, and the question presented for our review is whether the amended complaint adequately sets forth a factual basis for the stalking charge. We conclude that it does and therefore reverse the judgment of dismissal and remand this case to the circuit court for further proceedings.

**The Amended Complaint**

¶2 The charge against Willis is grounded in events that occurred over the course of two and a half months, from mid-December 2020 to the end of February 2021. The amended complaint alleges the following facts.

¶3 Mary[2] met Willis on a dating website in December 2019, and the two began a romantic relationship.[3] After some pressure from Willis, Mary moved in with him by September 2020. Before she moved in with Willis, Mary began to notice "signs of … controlling behavior," such as him "showing up at her apartment when he couldn't get ahold of her via telephone and figuring out the

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] We refer to the victim by a pseudonym consistent with the policy set forth in WIS. STAT. RULE 809.86(1).

[3] Mary was married and divorced twice before she began dating Willis and reported no problems with either of her ex-husbands. She also dated one person for several months between her second divorce and the start of her relationship with Willis and remained friends with that person.

password to her phone to look at her text conversations." Other controlling behaviors occurred after the two began living together, and Mary noticed Willis "attempting to isolate her from her adult children."

¶4 Mary told police that Willis "kicked her out of his place on three separate occasions." On the third occasion, Willis became angry after looking through Mary's text messages with her daughter about Mary "needing to find her own place to live." Willis summoned the police, identified himself as a retired officer, and "cornered" Mary as she moved her things out and "ask[ed] her not to leave and then at another point was screaming at her and she left without all her things." When Mary eventually returned to retrieve her belongings, Willis "would continually try to get her to stay [and] told her he was a changed man, he was wrong."

¶5 Mary told Willis that "she no longer wanted to see him" on December 15, 2020. Over the following two and a half months, Willis attempted to contact Mary forty-five times by phone call, voicemail, and text message, nearly all of which went unanswered by Mary.

¶6 Willis continued to send these communications after he was repeatedly told not to contact Mary and warned that his behavior may constitute stalking. On December 23, 2020, Mary responded to several text messages by asking Willis not to contact her and telling him she would call the police if he came to her residence. Several days later, on December 27, Willis was told by police to stop contacting Mary. Willis attempted to contact Mary twenty-five times via phone and text after December 27. In addition, on January 8, 2021, a Fond du Lac police officer read a "stalking warning letter" to Willis. The letter advised that his behavior towards Mary had been investigated by police, had

"induced … fear or distress" in her, and "could be interpreted as 'stalking' as defined by [WIS. STAT. §] 940.32." The letter warned Willis that "any future conduct by [him] towards [Mary]" could result in his arrest and prosecution. Sixteen of Willis's phone calls, voicemails, and text messages were sent after the letter was read to him.

¶7    Some of the text messages asked if Mary wanted to talk, but others went further and expressed frustration or anger at her unwillingness to do so. For example, on December 24, 2020, Willis texted Mary the following:

> [Mary] do you[] really care that little about me now[?] Just cant believe you turned so cold of a human being. I didn't sleep again allnight too distraught. Don't understand how you can be like this now after how we were. If you even get this i never know. Im sure you[']re with another by now.

In addition, on January 27, 2021, Willis texted Mary that he had received "a big Social Security envelope for you with al[l] this information in it including your Social Security number. You want it?" Mary checked with the social security office and confirmed that they had her correct address and had not sent her anything recently.

¶8    In addition to Willis's repeated attempts to contact Mary, the amended complaint details several other incidents that occurred during the relevant time period. On the night of December 24, 2020, hours after Mary received a voicemail from Willis in which "he was sobbing and … saying he was sorry," someone spray painted "I SUCK COCK" in red letters across Mary's white garage door.

¶9    On December 28, 2020, Mary's daughter informed Mary that she had received a letter purporting to be from Willis. (Mary did not know how Willis

had learned her daughter's name or her address.) The letter, which began, "[t]his is Brian, mom's recent ex," accused Mary of being a liar, "describe[d] their sexual relationship in some detail including how [Mary] likes rough sex," and discussed Mary's prior sexual relationships and "faults" in her relationship with Willis. Mary recognized the handwriting in the letter as Willis's.

¶10 Several days later, Mary drove her 2001 Lexus to her son's residence for New Year's Eve. Shortly after midnight, as Mary drove home, her car "sputtered and stopped and would not 'turn over.'" The next day, Mary noticed that the cover to the car's gas tank "looked like it had been pried open, was slightly chipped and it would not fully close." Mary had the car towed and was later informed that the gas line needed to be replaced because "a fine granular substance had been added to her gas [tank]." (Three months earlier, Mary "had the car looked over and was told she would be good for another 100,000 miles.") Mary normally kept the car in the garage except when she was driving it, and Willis knew where her son lived.

¶11 The amended complaint also details how Willis's behavior impacted Mary. She told police that she changed her walking route and no longer walks at night. She keeps the lights off when she is home at night "so [Willis] does not see any lights or indication she is there." She is scared to leave her apartment and avoids stores she used to shop at because Willis knows them, and she "makes sure nobody is behind her" when she gets home. She also purchased a personal alarm to carry when out of her apartment. She described being fearful when she saw another call or text from Willis and afraid Willis "will hurt or kill her." These feelings intensified when the warnings from police did not stop him from contacting her. Mary told police she wanted "to pursue a restraining order against

[Willis], because she is very scared of him" but has not out of concern for "how angry he might be over this."

### The Circuit Court's Decision

¶12 The circuit court held a hearing on Willis's motion to dismiss on May 18, 2021. After hearing arguments from the parties, the court concluded that the phone calls, text messages, and the letter to Mary's daughter constitute a "course of conduct" under the stalking statute. *See* WIS. STAT. § 940.32(2)(a). The court did not consider the spray-paint incident or the problem with the gas line in Mary's car to be part of the course of conduct because "there just isn't a factual nexus to tie Mr. Willis to those events." The court also concluded that the amended complaint contained "ample information that the allegations … have had a significant impact on the victim." *See* Sec. 940.32(2)(c) (requiring that the defendant's conduct "cause the specific person to suffer serious emotional distress or induce fear in the specific person of bodily injury to or the death of himself or herself or a member of his or her family or household"). But, the court concluded that the amended complaint was deficient because the phone calls and the content of the text messages would not "cause a reasonable person to suffer serious emotional distress or fear of bodily injury or death."

### Discussion

¶13 The key threshold a criminal complaint must clear is probable cause. *State v. White*, 97 Wis. 2d 193, 197, 295 N.W.2d 346 (1980). To establish probable cause, the complaint "must set forth facts within its four corners that, together with reasonable inferences from those facts, would allow a reasonable person to conclude that a crime had been committed and that the defendant was probably the person who committed it." *State v. Chagnon*, 2015 WI App 66, ¶7,

364 Wis. 2d 719, 870 N.W.2d 27. Another way of phrasing the standard is that the complaint must "answer[] the following questions: '(1) Who is charged?; (2) What is the person charged with?; (3) When and where did the alleged offense take place?; (4) Why is this particular person being charged?; and (5) Who says so? or how reliable is the informant?'" *State v. Reed*, 2005 WI 53, ¶12, 280 Wis. 2d 68, 695 N.W.2d 315 (quoting *White*, 97 Wis. 2d at 203).

¶14 However the standard is phrased, probable cause is a low bar; it requires only that the complaint be minimally adequate. *State v. Olson*, 75 Wis. 2d 575, 581, 250 N.W.2d 12 (1977). In determining whether a complaint establishes probable cause, we examine the facts alleged "in a common sense rather than a hypertechnical manner." *State v. Adams*, 152 Wis. 2d 68, 73, 447 N.W.2d 90 (Ct. App. 1989). Whether the complaint establishes probable cause is a legal issue that we review de novo. *Reed*, 280 Wis. 2d 68, ¶11.

¶15 Wisconsin's stalking statute requires proof of four elements. *See* WIS. STAT. § 940.32(2); WIS JI—CRIMINAL 1284. First, the defendant must "intentionally engage[] in a course of conduct directed at a specific person." Sec. 940.32(2)(a).[4] Second, the course of conduct must be such that it "would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household." *Id.* A person suffers "serious

---

[4] The statute defines "[c]ourse of conduct" as "a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose." WIS. STAT. § 940.32(1)(a). As we explained in *State v. Hemmingway*, 2012 WI App 133, ¶6, 345 Wis. 2d 297, 825 N.W.2d 303, the eleven acts listed in the statute "that can form the basis of a course of conduct…. are not crimes. These are legitimate acts which could become part of the stalking course of conduct if they show a continuity of purpose and satisfy the elements of the crime."

emotional distress" if he or she "feel[s] terrified, intimidated, threatened, harassed, or tormented." Sec. 940.32(1)(d). Next, the State must show that the defendant "knows or should know that at least one of the acts that constitute the course of conduct will cause the specific person to suffer serious emotional distress or place the specific person in reasonable fear of" death or bodily injury to "himself or herself or a member of his or her family or household." Sec. 940.32(2)(b). Finally, the defendant's acts must actually "cause the specific person to suffer serious emotional distress or induce fear in the specific person of bodily injury to or the death of himself or herself or a member of his or her family or household." Sec. 940.32(2)(c).

¶16 We address each element below and conclude that a commonsense reading of the allegations in the amended complaint, along with reasonable inferences from those facts, would allow a reasonable person to conclude that Mary had been the victim of stalking and that Willis was probably the person who committed that offense. *See Chagnon*, 364 Wis. 2d 719, ¶7.

## I. The Amended Complaint Alleges that Willis Intentionally Engaged in a Course of Conduct Directed at Mary.

¶17 As to the first element, the State argues that the allegations concerning Willis's phone calls, voicemails, and text messages to Mary, along with his letter to her daughter, establish probable cause to believe that Willis intentionally undertook a "course of conduct" directed at Mary. Willis agrees that the "repeated messaging" can be part of the course of conduct but that the "content of the messages themselves" cannot be because none of the content rises to the level of a "true threat." We accept Willis's concession that his conduct in repeatedly sending unwanted messages to Mary is properly considered to be part of the course of conduct alleged in this case.

¶18 We also reject Willis's "true threat" argument because it is based on a misreading of our decision in *State v. Hemmingway*, 2012 WI App 133, 345 Wis. 2d 297, 825 N.W.2d 303. There we rejected a First Amendment overbreadth challenge to WIS. STAT. § 940.32 after concluding that it targets conduct, not speech, even if a "stalker [uses] language in his or her commission of the proscribed acts." *Hemmingway*, 345 Wis. 2d 297, ¶16. As was the case in *Hemmingway*, the voicemails and text messages Willis sent to Mary "were evidence of [his] intent to cause [Mary] to fear bodily injury or death, contrary to the stalking statute." *Id.* "Such intimidating conduct," we wrote, "serves no legitimate purpose and merits no First Amendment protection." *Id.* So too here. Our discussion in *Hemmingway* did not even mention the "true threat" doctrine, much less limit the statute's constitutional application to that category of speech.

¶19 Because the acts that constitute the "course of conduct" bear on our analysis of the other elements of the offense and will be important to proceedings on remand, we clarify that the "course of conduct" here may also include the spray-painting and gas-tank incidents. The circuit court did not include these incidents because it did not believe the amended complaint contained sufficient facts linking Willis to those events. We disagree.

¶20 Mary reported to police that her garage was spray painted on the night of December 24, 2020 or the early morning of December 25, 2020. This occurred ten days after Mary told Willis in person that she no longer wanted to see him, one day after Mary texted Willis to tell him not to contact her and that she would call the police if he came to her residence, hours after Willis left her a voicemail and text messages expressing despair, fear, resentment, and anger at her, and several days before Mary's daughter received a letter purporting to be from Willis that described Mary's sexual past and preferences. The close proximity in

time of the spray painting to these communications, along with Willis's prior outbursts of anger towards Mary, Willis's disregard of her wish not to communicate with him, and the obscene nature of the spray-painted words, sufficiently link Willis to the incident at this stage of the case.

¶21 Willis notes that the amended complaint refers to Mary's two ex-husbands and a third man she dated before Willis and argues that "it is certainly possible that any of those people, or anyone else in the universe, could have spray-painted on her garage door." This argument does not carry the day for two reasons. First, in determining whether a criminal complaint establishes probable cause, we are not required to credit an explanation that points to a defendant's innocence. *See State v. Higginbotham*, 162 Wis. 2d 978, 995, 471 N.W.2d 24 (1991). Second, Willis's argument disregards the allegations in the amended complaint concerning Mary's relationships with Willis and those other individuals. Mary described her first divorce as "amicable" and said she had "no issues 'whatsoever'" with her second husband. She told police that she was still "friends" with the person she dated before Willis and that "there was … 'no way'" that individual could have damaged her property. In stark contrast, the amended complaint details Willis's controlling behavior, repeated angry outbursts at Mary, and repeated disregard of her wish not to speak with him. It is reasonable to infer from these facts that Willis was involved in the spray-painting incident.

¶22 We reach the same conclusion concerning the possible tampering with the gas line in Mary's vehicle. Mary reported experiencing engine failure shortly after leaving her son's house on New Year's Eve, despite having been told three months earlier that the vehicle "would be good for another 100,000 miles." The following day, the cover to Mary's gas tank "looked like it had been pried open, was slightly chipped and it would not fully close anymore." She was later

"told a fine granular substance had been added to her gas [tank]," which required replacement of the vehicle's gas line. Finally, Mary told police that hers was the only vehicle at her son's house that was damaged and that Willis knew where her son lived. Against the backdrop of Willis's then-recent messages and other actions discussed above, if Mary's car was in fact tampered with, the amended complaint sets forth facts from which a reasonable inference may be drawn that Willis was responsible.

**II.   The Course of Conduct Alleged in the Amended Complaint Would Probably Cause a Reasonable Person to Suffer Serious Emotional Distress or to Fear Bodily Injury or Death.**

¶23   The circuit court concluded that the amended complaint did not satisfy the second element of stalking because the content of Willis's telephone calls and text messages would not "cause a reasonable person to suffer serious emotional distress or fear of bodily injury or death." We disagree with the court's conclusion.

¶24   As we have already discussed, the "course of conduct" here is not limited to the texts and voicemails. It also includes the spray-painting and gas-tank incidents and the letter to Mary's daughter. In addition, the circuit court's focus on the *content* of the texts and voicemails does not give due significance to either the significant number of Willis's unwanted attempts to reach Mary or the fact that he repeatedly disregarded requests and warnings by her and the police to cease that conduct.

¶25   Moreover, the totality of the allegations establishes probable cause to believe that a reasonable person would experience serious emotional distress. Under the stalking statute, the phrase "'[s]uffer[s] serious emotional distress' means to feel terrified, intimidated, threatened, harassed, or tormented." WIS.

STAT. § 940.32(1)(d). In analyzing this element, the inquiry is objective: we must determine whether the defendant's alleged conduct would prompt this reaction in "a person of ordinary intelligence and prudence" in the victim's position "under the circumstances that existed at the time of the course of conduct." WIS JI— CRIMINAL 1284.

¶26 We conclude that Willis's alleged conduct would probably cause an ordinarily prudent and intelligent person in Mary's shoes to experience serious emotional distress. The amended complaint alleges that Willis attempted to or did contact Mary forty-five times against her wishes over a two-and-a-half-month period and in defiance of warnings by law enforcement not to do so. In addition, the allegations suggest that he entered her property during the night-time hours and defaced it, entered her son's property at night to tamper with her vehicle, and mailed a wholly inappropriate letter to her daughter. One could reasonably infer from these acts that Willis was emotionally unstable, harbored hostility, resentment, and vengefulness towards Mary, would not be deterred by law enforcement intervention, and knew where her children lived. We agree with the State that "it is not too much of a stretch to suggest that a reasonable person" who had just ended an intimate relationship with Willis would feel terrified, intimidated, threatened, harassed, or tormented by his behavior.

¶27 Willis attacks the veracity of certain details in the amended complaint, but his arguments do not persuade us to reach a contrary conclusion. First, citing our supreme court's decision in *State ex rel. Evanow v. Seraphim*, 40 Wis. 2d 223, 230, 161 N.W.2d 369 (1968), Willis argues that the complaint, which rests in part on "information and belief," must set forth sufficient detail for us to conclude that the source of the information—here, Mary—is probably truthful. Willis questions the State's reliance on Mary's "word" that she told Willis on

December 15, 2020, that she did not want to see him anymore and that she believes Willis spray painted her garage door. He also describes her allegation that her car was tampered with on New Year's Eve as "[c]onjecture," suggesting instead that a car as old as hers could reasonably be expected to have difficulty running in cold weather.

¶28 These arguments are not attuned to our task. We do not decide in this appeal whether the events recounted by Mary in the amended complaint actually occurred. Under *Seraphim*, 40 Wis. 2d at 230, our only task is to determine whether the complaint sets forth enough detail to support a reasonable inference that she is probably telling the truth. We have no difficulty concluding that it does. The portions of the complaint that appear to rest on Mary's recitation of events are clear, coherent, and detailed. She provided dates and locations for many of the relevant communications and events. She also appears to have provided to police evidence to corroborate portions of her account, such as the letter received by her daughter and the voicemails and text messages left by Willis. In addition, the investigating officer also recounted in the amended complaint an incident in which Mary received a call from a number she knew to be Willis's while she was speaking with the officer. According to the amended complaint, the officer "answered the phone by picking up, and there was silence until she hung up. Within a couple of minutes of that call, [Willis] sent a text message asking if they could talk." The facts alleged are more than sufficient to support a reasonable inference that Mary probably provided a truthful account.

¶29 Willis also attacks the allegations respecting the letter Mary's daughter received and states that "there is nothing in the complaints that corroborate[s] whether that letter was sent from Willis" or another man with whom Mary had a prior intimate relationship. This argument ignores entirely two

allegations linking Willis to the letter. First, the letter allegedly began with the words "[t]his is Brian, mom's recent ex." In addition, Mary told police that she recognized the handwriting as Brian's, in part because of "how he wrote the letter 's.'" We disagree with Willis that these circumstances do not support a reasonable inference that Willis sent the letter.

### III. The Allegations Support a Reasonable Inference that Willis Knew or Should Have Known that at Least One Act Within the Course of Conduct Would Cause Mary to Suffer Serious Emotional Distress or Reasonably Fear Bodily Injury or Death.

¶30 With respect to the third element of the offense, the State focuses on the unsolicited letter Willis allegedly sent to Mary's daughter. The State argues that Willis knew—and indeed intended—that the letter would harass and humiliate Mary because it disclosed intimate details about her sex life to one of her children. Willis disagrees that the amended complaint sufficiently links him to the letter and suggests that because his communications with Mary were not "of a threatening nature," he had no basis to suspect that a reasonable person on the receiving end of them would "suffer serious emotional distress." *See* WIS. STAT. § 940.32(2)(b).

¶31 We have already identified the facts in the amended complaint that support a reasonable inference that Willis wrote the letter. And, we agree with the State that the contents of the letter, together with its timing, support an inference that Willis knew it would cause Mary to feel harassed or tormented. In addition, as discussed above, Willis's focus on the supposedly nonthreatening nature of his messages to Mary ignores the quantity of messages and the surrounding context. Specifically, Willis continued to send unwanted texts and phone calls to Mary after she told him on December 23, 2020, that she would call the police if he came

to her house, and that she did not want him to contact her. He continued to do so after police told him to stop contacting Mary on December 27, 2020.[5] He continued to do so after the stalking warning letter was read to him on January 8, 2021. Together, these three warnings put Willis on notice that his behavior had frightened and concerned Mary enough to go to the police. At a minimum, the allegations support a reasonable inference that Willis knew or should have known that any of the attempts to contact Mary after the stalking warning letter was read to him would cause her to feel "terrified, intimidated, threatened, harassed, or tormented." *See* WIS. STAT. § 940.32(1)(d).

### IV. The Amended Complaint Alleges that Willis's Acts Caused Mary to Suffer Serious Emotional Distress.

¶32 Finally, the amended complaint alleges that Mary did in fact suffer serious emotional distress as the result of Willis's conduct. Mary told police that she believed Willis became angered when she initially stopped responding to his attempts to contact her and that after he sent the letter to her daughter, she became concerned that his "behavior is escalating." She later described feeling "fear" "when she sees there is another text or call from him" and told police she is afraid Willis "will hurt or kill her. She said she has anxiety over it, it's embarrassing, and she now has a hard time concentrating on things and has become forgetful." She also relayed that her fear increased when Willis did not stop contacting her after law enforcement became involved.

---

[5] Willis attempts to minimize the legal significance of the December 27 police warning by faulting the amended complaint for not identifying the "tone and tenor of that conversation." We are not persuaded; the salient point for the purpose of a probable cause analysis is that Willis was told to stop contacting Mary.

¶33    The amended complaint also suggests that the fear and intimidation Mary experienced prompted her to make significant changes in her life to minimize the risk of encountering Willis. It alleges that Mary told police she changed her walking route and no longer takes walks at night. It alleges that she avoids leaving her apartment unless necessary and sits in the dark at night so as not to give the impression that she is at home. The amended complaint alleges further that Mary avoids certain stores that Willis knows she patronizes and that she purchased a personal alarm to carry when she leaves her apartment. Contrary to Willis's suggestion that the causal link between his conduct and these changes in her daily routine is "speculative," the amended complaint directly links the two by alleging that she changed certain aspects of her life "due to [his] behavior."

¶34    In sum, the amended complaint clears the low threshold necessary to establish probable cause. It identifies who is being charged, specifies the crime allegedly committed, identifies the dates, times, and locations of the acts that allegedly constitute the offense, explains why the State believes Willis committed the offense, identifies the sources of the facts alleged to constitute the offense, and provides sufficient detail to support a conclusion that those sources are reliable enough to support the charge. *See Reed*, 280 Wis. 2d 68, ¶12.

**Conclusion**

¶35    We end by emphasizing the preliminary and limited nature of our holding. We have concluded only that the facts alleged in the amended complaint are sufficient to establish probable cause for the charged offense. It remains the State's burden to prove whether Willis is guilty beyond a reasonable doubt at trial.

*By the Court.*—Judgment reversed and cause remanded.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.